Timothy A. Scott (SBN 215074)
Lauren M. Williams (SBN 306918)
Michelle C. Angeles (SBN 298883)
MCKENZIE SCOTT PC
1350 Columbia Street, Suite 600
San Diego, California 92101
Telephone: (619) 794-0451
Facsimile: (619) 652-9964
Email: tscott@mckenziescott.com
        lwilliams@mckenziescott.com
        mangeles@mckenziescott.com

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ESTATE OF AARON DANIEL BONIN, BY AND THROUGH HIS SUCCESSOR-IN-INTEREST BARBARA BRISSON; BARBARA BRISSON, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST, <br><br> Plaintiffs, <br><br> V. <br><br> COUNTY OF SAN DIEGO; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; ANTHONY RAY, IN HIS INDIVIDUAL CAPACITY; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; DINA CRUZ, MD IN HER INDIVIDUAL CAPACITY; JOY IRWIN, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS (CHP); NAPHCARE, INC.; DEFENDANT DEPUTIES DOES 1-14, IN THEIR INDIVIDUAL | Case No.: **'23 CV 2158 BEN MSB** <br><br> **COMPLAINT FOR DAMAGES FOR:** <br> 1. **42 U.S.C. § 1983: Deliberate Indifference** <br> 2. **42 U.S.C. § 1983: Substantive Due Process** <br> 3. **42 U.S.C. § 1983: Deliberate Indifference (*Monell*)** <br> 4. **42 U.S.C. § 1983: Substantive Due Process (*Monell*)** <br> 5. **Cal. Gov. Code § 52.1 (Bane Act)** <br> 6. **Cal. Gov. Code § 845.6 (Failure to Summon Medical Care)** <br> 7. **Wrongful Death** <br> 8. **Negligence** <br> 9. **Negligence: Negligent Training and Supervision** <br><br> **DEMAND FOR JURY TRIAL** |

CAPACITIES; DEFENDANT
MEDICAL PROVIDERS DOES 1-10,
IN THEIR INDIVIDUAL
CAPACITIES; DEFENDANT DEPUTY
SUPERVISOR DOES 1-10, IN THEIR
INDIVIDUAL CAPACITIES,

          Defendants.

COMPLAINT

**INTRODUCTION**

1.      Aaron Daniel Bonin ("Aaron") died at the age of 43 while in custody at the San Diego County Jail on November 1, 2022.  His death was entirely preventable.

2.      Aaron suffered from severe mental illness, and as a result, had been civilly committed for over a decade.  Aaron also suffered from several health conditions including renal disease which required him to receive frequent dialysis or risk serious illness or death.  Due to his psychological and physical illnesses, and his indefinite involuntary commitment, Aaron was particularly vulnerable and completely dependent on his custodians for his care.

3.      At the jail, County employees and other medical staff deliberately failed to care for him despite his pleas for help leading up to his death.

4.      Plaintiff Barbara Brisson, individually and in her capacity as successor-in-interest representing the Estate of Aaron Bonin (hereinafter "Plaintiff"), sues to seek justice and recover damages arising from the wrongful death of her son Aaron while he was in the care and custody of the County at the San Diego Central Jail.

5.      Plaintiff requests a jury trial to pursue justice on these claims.

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff assert causes of action for constitutional violations arising under 42 U.S.C. § 1983.

7.      The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  In accordance with the requirements of the California Tort Claims Act (Cal. Gov. Code §§ 810-996.6), Plaintiff filed a timely tort claim against the County of San Diego and its employees under Cal. Gov. Code § 900.4 on April 11, 2023.  Defendants mailed Plaintiff a notice of rejection of claim on May 23, 2023.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arise out of events and omissions occurring in the County of San Diego, which is situated in the Southern District of California.

## PARTIES

9.      Plaintiff Barbara Brisson is and was, at all times relevant to this Complaint, residing in Spartanburg, South Carolina. Barbara Brisson is the mother of decedent Aaron Daniel Bonin.  In addition to suing individually for personal damages arising from losing her son, Plaintiff sues as Aaron's successor-in-interest to prosecute all claims surviving Aaron's death pursuant to Cal. Civ. Code § 377.30.  *See* Exhibit A, Declaration by Barbara Brisson; Exhibit B, Death Certificate.

10.      Defendant County of San Diego (hereinafter "County") is a governmental entity organized and existing under the laws of the State of California.

11.      Defendant Anthony Ray (hereinafter "Ray") was Interim Sheriff for the San Diego County Sheriff's Department from April 5, 2022, after Sheriff William Gore retired, to January 9, 2023, when Defendant Kelly Martinez was sworn in as Acting Sheriff.  As Interim Sheriff, Ray was a final policymaker for the Sheriff's Department and for the County on matters relating to the Sheriff's Department, the San Diego County Jail, and its deputies, employees, and agents. He was also responsible for the County's compliance with state and federal laws and constitutions and for the training and supervision of County employees and agents.

12.      Defendant Kelly Martinez (hereinafter "Martinez") was the Undersheriff for the San Diego County Sheriff's Department at the time of Aaron's death. In her capacity as Undersheriff, Martinez was a final policymaker for the Sheriff's Department and for the County on matters relating to the Sheriff's Department, the San Diego County Jail, and its deputies, employees, and agents.

She was also responsible for the County's compliance with state and federal laws and constitutions and for the training and supervision of County employees and agents.

13.     Defendant Dr. Jon Montgomery, DO was, at all times relevant, the Chief Medical Officer for the Sheriff's Department and was responsible for overseeing the Medical Services Division at the San Diego County Jail.  He was responsible for and oversaw the development and implementation of quality assurance and utilization review policies and procedures.  All medical and psychiatric doctors and staff at the San Diego County Jail worked under Dr. Montgomery's direction.  He is sued in his individual capacity for his failure to properly treat Aaron, failure to properly oversee Aaron's care, and failure to supervise other medical staff in caring for Aaron.

14.     Defendant Dina Cruz, MD (hereinafter "Cruz") was, at all times relevant, a physician employed with the Sheriff's Department and providing medical care at the Central Jail.  She was acting within the scope of her employment at all times relevant to this Complaint.

15.     Defendant Joy Irwin RN (hereinafter "Irwin"), at all times relevant, was a Registered Nurse employed by the San Diego Sheriff's Department in the Medical Services Division at the San Diego County Central Jail, and was acting within the scope of her employment at all times relevant to this Complaint.

16.     Defendant NaphCare, Inc. ("NaphCare") was a third-party contractor to the San Diego County Sheriff's Department.  NaphCare's contract with the County began in June 2022 and continued through the date of Aaron's death.  NaphCare was responsible for providing medical care staffing and on-site medical services to detainees in the San Diego County Jail.  NaphCare, with Defendant County, was responsible for and oversaw the development and implementation of peer review, quality assurance, utilization review, and clinical policies and procedures.

17.     Defendant Correctional Healthcare Partners ("CHP") had a contractual relationship with NaphCare beginning in June 2022 and on information and belief, was a subcontractorresponsible for providing medical care staffing and on-site medical services to detainees at the San Diego Central Jail.

18.     Defendants NaphCare and CHP employed, supervised, and/or trained Defendant Medical Provider Does 1-10.

19.     Defendant Deputy Does 1-14 are all Sheriff's Department deputies who were responsible for summoning medical or mental health care, observing any audio or video monitors, responding to call buttons, and/or conducting wellness or safety checks on Aaron in any housing unit in which Aaron was housed including but not limited to Module 7D.

20.     Defendant Deputy Does 1-14 will hereinafter be referred to collectively as "Doe Deputies" unless otherwise noted.  Doe Deputies were acting under color of law and within the scope of their employment at all times relevant to the events described in this Complaint.

21.     Defendant Deputy Supervisor Does 1-10 (hereinafter "Doe Deputy Supervisors") are Sheriff's Department deputies who were responsible for training and supervising Doe Deputies.  Doe Deputy Supervisors were acting under color of law and within the scope of their employment at all times relevant to the events described in this Complaint.

22.     Defendant Medical Providers Does 1-10 (hereinafter "Doe Medical Providers") are all County employees, agents, or contractors working within the Sheriff's Department Medical Services Division who were responsible for Aaron's medical care, including follow-up assessments and referrals for further treatment, whether or not they actually provided Aaron with any medical care.   To the extent Doe Medical Providers were employees of the County, they were acting under color of law and within the scope of their employment at all times relevant to the events described in this Complaint.  To the extent Doe Medical Providers were

third-party contractors to the County through their employment with NaphCare or CHP (or any other third-party contractor), they were acting within the scope of their employment with said third-party contractor.

23.     Doe Deputies and Doe Medical Providers are sued in their individual capacities for the purposes of claims arising under § 1983 and as County employees, or employees of third-party contractors such as NaphCare and CHP, for the purposes of claims arising under state law.

24.     Plaintiff are ignorant of the true names of all Doe Deputies, Doe Deputy Supervisors, and Doe Medical Providers despite due diligence and will amend the Complaint to add their true names upon learning them.

25.     The San Diego County Central Jail (hereinafter "Central Jail") is owned and operated by Defendant County and staffed by County employees, agents, and contractors.

## FACTUAL ALLEGATIONS

### A. Aaron Bonin's Pain, Suffering, and Death In Custody

26.     On September 1, 2022, Aaron was transferred to the San Diego Central Jail from the Department of State Hospitals forensic psychiatric facility in Patton, California for civil commitment reconsideration proceedings.

27.     Jail staff, including deputies and medical staff, were aware of Aaron's chronic conditions and need for extensive medical care because he had been in their care and custody many times previously and Defendants had access to his records, including medical records.

28.     Aaron suffered from several well-documented chronic medical conditions, including renal disease, as well as severe mental health diagnoses which resulted in his civil commitment years prior.

29.     Aaron required dialysis two to three times per week and required a "renal diet," which excluded bananas due to their potassium content.

30.     A normal blood potassium level is 3.6 to 5.2 millimoles per liter (mmol/L). Having a blood potassium level above 6.0 mmol/L can be dangerous and requires urgent treatment to stabilize the potassium level.

31.     On September 26, 2022, Aaron's potassium level was 6.4 prior to dialysis, which was "critical[ly]" high.  Aaron was taken to the hospital that day to receive dialysis because the machines at the Central Jail were not working. According to discharge papers, high blood potassium levels are very dangerous to the heart.

32.     On October 17, 2022, despite Aaron's history of high blood potassium levels, Defendant Cruz allowed Aaron to have a normal diet instead of a renal diet.

33.     On information and belief, this would have meant that Aaron was then given bananas at meals, increasing his risk of having dangerously high blood potassium level (or "hyperkalemia"), which could cause serious illness or death.

34.     On or about October 19 or 20, 2022, Aaron's bloodwork once again revealed a dangerously high blood potassium level—6.3-6.4 mmol/L.

35.     On October 21, 2022, medical staff provide Aaron with dialysis to lower his blood potassium levels.  On information and belief, staff did not re-test his potassium levels after dialysis that day.

36.     Further, on information and belief, Aaron remained on a normal diet as opposed to a renal diet excluding potassium-rich foods.

37.     On the night of October 23, 2022, Aaron fell ill.

38.     Aaron was due to receive dialysis on October 24, 2022.

39.     Thus, Mr. Bonis was medically vulnerable and at heightened risk during this period of time.  Dialysis would have corrected any abnormal blood levels that posed health risks to him.

40.     On information and belief, there were three deputies on duty the night of October 23, 2022 in module 7D.  On information and belief, one of the deputies

had the last name "Romans" and another had the last name "Luken."  These deputies are named as Doe Deputies.

41.     That night, around 11:00 p.m. or midnight, Aaron began calling out for help.

42.     At an unknown time[1] that evening, Defendant Irwin was asked by a Doe Deputy on duty to check on Aaron. She found Aaron lying on the floor. He told her "I feel like I am having hypotension." She checked his blood pressure only, assured Aaron his blood pressure was okay, and left.

43.     Defendant Irwin did not input a note in the jail information system ("JIMS") that evening.  Rather, the note is marked as a late entry—a notorious forensic red-flag in jail-death cases.  Irwin updated the JIMs system two to three days later on October 26, 2022.

44.     After Irwin checked Aaron's blood pressure, Aaron continued to feel unwell and continued to call out for help.  He begged to go to the hospital.

45.     Pursuant to Cal. Code Regs. Tit. 15, § 1027.5, sworn staff such as Doe Deputies are required by law to conduct safety checks of incarcerated persons "through direct visual observation" with no more than a 60-minute lapse between safety checks.

46.     The Doe Deputies on duty in Aaron's module came by to do routine rounds while Aaron was pleading for medical aid, but ignored his pleas, stating that his vitals had been checked and he was fine.

47.     As time went on, Aaron's pleas became more desperate.  He begged to be taken to the hospital.

_____

[1] The time is unknown because Defendant Irwin did not include the time in her entry and entered the note days late–on October 26, 2022.

48.     Other detainees attempted to get deputies' attention between rounds by using the call buttons and intercoms, but no deputies appeared.

49.     On information and belief, the call buttons were not properly maintained and did not always work properly.

50.     And if call button were in working order, the deputies ignored the calls.

51.     Aaron continued to call for help and each time a deputy came by for rounds, they ignored his pleas and did nothing to help him.

52.     No deputies summoned medical care.

53.     Aaron's cries for help fell quieter and weaker until he fell silent around 3:00 a.m. on October 24, 2022.

54.     While conducting routine safety checks—and not in response to Aaron's cries for help—deputies found Aaron unresponsive on the floor of his cell around 3:16 a.m.

55.     A deputy began CPR and medical staff arrived at 3:23 a.m. to take over life-saving efforts.

56.     Aaron was pulseless and not breathing. His skin was cold and clammy and he was cyanotic (appearing blue-purple).

57.     Fire Department personnel arrived around 3:31 a.m. and continued efforts until they departed with Aaron to the hospital.

58.     Aaron was admitted to University of California, San Diego – Hillcrest hospital in critical condition.

59.     According to medical records, Aaron had suffered cardiac arrest and had been down for approximately ten minutes prior to deputies beginning CPR.

60.     Upon being admitted to the emergency department, Aaron's blood potassium level was 8.0 mmol/L—far above a normal range.

61.     A subsequent MRI revealed diffuse hypoxic ischemic injury, which is a brain injury that results from prolonged lack of oxygen, undoubtedly due to

deputies ignoring Aaron's pleas for help, allowing him to suffer cardiac arrest, and belatedly beginning CPR after Aaron lost consciousness and ceased breathing.

62.     On November 1, 2022, Aaron was pronounced dead.

**B. The County's, CHP's, and NaphCare's Long History of Deliberate Indifference to Detainees' Health, Mental Health, and Constitutional Rights**

63.     From 2006 through 2020, a total of 185 people died in San Diego County's jails—a rate higher than any other large county across the State.

64.     In both 2021 and 2022, the infamous Rikers Island jail had fewer deaths despite a far larger jail population.

65.     The County is also well-aware that drug use among individuals in custody in San Diego County jails was at a 22-year high in 2021.[2]  In 2021, a staggering 83% of adult male arrestees tested positive for at least one controlled substance.  Further, 56% of adults reported beginning using illicit substances as substitutes for medication they had previously been prescribed for ADHD or ADD.

66.     In February 2022, the California State Auditor completed its audit[3] of the San Diego County Sheriff's Department to determine the cause of the high rate of in-custody deaths in San Diego County jails and to identify any steps that the Sheriff's Department took in response to those deaths.

67.     The Auditor reviewed data over a 15-year period.

68.     The Auditor found deficiencies in caring for and protecting individuals, which likely contributed to in-custody deaths.

---

[2] *See* SANDAG, *2021 Adult Arrestee Drug Use in the San Diego Region*, available at: https://www.sandag.org/-/media/406C28D7970844A899C0C808FF3834FB.ashx.

[3] Plaintiff incorporate herein by reference the State Auditor's report: https://www.auditor.ca.gov/pdfs/reports/2021-109.pdf.

69.     Also, these were not limited occurrences—the audit's findings "suggest[ed] that the problems with the Sheriff's Department's care for incarcerated individuals are systemic."

70.     Specifically, the Auditor found the following deficiencies:

a.  Inadequate and inconsistent provision of medical and mental health care;

b.  Inadequate and inconsistent identification of individuals' health care needs during intake;[4]

c.  Inadequate and inconsistent follow-up regarding medical and mental health needs;

d.  Inadequate and inconsistent performance of visual checks to ensure the health and safety of detainees;

e.  Failure to implement meaningful corrective action to guard against future deaths when deaths have occurred;

f.  Failure to adequately investigate and review in-custody deaths;

g.  Failure to implement key recommendations from external entities related to detainees' welfare and safety; and

h.  And inadequate policies.

71.     State auditors found that the department had yet to meaningfully implement recommendations made by independent experts over the last several years.

72.     The San Diego Citizens' Law Enforcement Review Board (CLERB) also conducted an analysis of data regarding in-custody deaths in San Diego

---

[4] Auditors noted that studies regarding health care at correctional facilities indicate that identifying individuals' health needs at intake is critical to ensuring their safety in custody.

County jails over the past 10 years, the results of which were released in April 2022.

73.    CLERB made the following findings, in pertinent part:

a.  Residents of San Diego County are no more likely to die than residents of other California counties;

b.  San Diego jails have the highest number of unexplained deaths compared with all other California counties when controlling for jail population;

c.  The risk of overdose/accidental deaths is the greatest in San Diego jails; and

d.  Elevated risk of death appears to be isolated to the unsentenced jail population.

74.    At the time of Aaron's death, the County, CHP, and NaphCare had *de facto* policies or widespread, longstanding practices or customs including but not limited to:

a.  Leaving individuals unattended in their cells for extended periods despite signs of medical or mental distress;

b.  Failing to summon medical or mental health care when obviously necessary;

c.  Failing to timely and adequately coordinate, share, or update internal information systems with critical medical or mental health information;

d.  Failing to adequately maintain call buttons and intercoms in working order in detainees' cells;

e.  Failing to provide adequate medical assessments and treatment to detainees;

f.  Failing to provide adequate follow-up medical treatment;

g. Failure to maintain adequate quality assurance systems to ensure proper medical care;

h. Failing to improve workflow processes and maintain adequate patient charting;

i. Failing to ensure third party contractors, such as NaphCare and/or CHP, maintain adequate workflow processes and patient charting;

j. Failing to provide medical or mental health treatment to individuals suffering from mental health conditions; and

k. Failing to adequately staff the medical services division.[5]

75.     In fact, the Critical Incident Review Board report regarding Aaron's death listed the following action item: "A Division of Inspectional Services sergeant will follow-up with the Medical Services Division on an ongoing basis to track the improvement of workflow processes on patient charting by outside medical providers."

76.     The number of deaths in custody in the San Diego County Jails continue and have continued at their disproportionately high rate since NaphCare's contract began (and thereby CHP's contract with NaphCare) in June 2022.[6]

---

[5] Unionized health care workers stated that understaffing created "dangerous and inhumane" conditions for people in custody and medical staff.  In June 2022, 199 medical division positions were vacant.  *See* Jeff McDonald, Kelly Davis, *Persistent medical staffing shortages in San Diego jails are causing lapses in care, driving down morale*, San Diego Union-Tribune, Sept. 4, 2022, available at: https://www.sandiegouniontribune.com/news/watchdog/story/2022-09-04/jail-staff-shortages.

[6] *See As in-custody deaths continue to plague county jails, two reform-minded bills face critical votes*, Sept. 2, 2023, available at: https://www.sandiegouniontribune.com/news/watchdog/story/2023-09-02/as-in-custody-deaths-continue-to-plague-county-jails-two-reform-minded-bills-face-critical-votes

77.   In 2022, nineteen people died in the custody of the San Diego County Jails.  Thus far in 2023, 13 people have died.

78.   Myriad cases demonstrate the County's, CHP's, and NaphCare's *de facto* policies or widespread, longstanding practices or customs described herein.

79.   For example, the Medical Examiner's office recently deemed Lonnie Rupard's in-custody death a *homicide*.

80.   Rupard died on March 17, 2022.

81.   Rupard exhibited symptoms of mental illness and distress during his time in custody and died in large part due to dehydration.

82.   He had elevated levels of sodium, chloride, and urea nitrogen.

83.   He also had pneumonia, a duodenal ulcer, and pressure sores on his back.

84.   Like Aaron, Rupard was neglected by deputies and medical staff despite obvious signs that he needed care.  The Deputy Medical Examiner concluded:

> Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death. While elements of self-neglect were present, ultimately this decedent was dependent upon others for his care; therefore, the manner of death is classified as homicide.

85.   Like Rupard, Aaron was dependent on staff for his care due in part to his deteriorating mental health.

86.     Additionally, Ronaldino Estrada,[7] a 24-year-old, was found dead on July 5, 2021, hours after his death alone in his cell.

87.     Estrada was likely dead for twelve hours before deputies found him, meaning deputies had not been conducting adequate safety checks in clear violation of law and policy.

88.     Estrada had a history of hypertension and suffered from cardio-respiratory arrest.

89.     Staff failed to take Estrada's vital signs or provide prescribed medications.

90.     Just as staff neglected Estrada, Defendants neglected to monitor Aaron's vital signs and on information and belief, failed to conduct timely and adequate safety checks.

91.     Additional examples are specifically incorporated herein by reference to the Second Amended Complaint, Doc. No. 34, ¶ 127 in *Serna v. County of San Diego et al*, 20-cv-2096-LAB.

92.     Further, Plaintiff specifically incorporates by reference the Second and Third Amended Civil Class Action Complaints for Declaratory and Injunctive Relief, Doc. Nos. 81 and 231, in *Dunsmore v. San Diego County Sheriff's Department et al*, 20cv00406-AJB.

93.     The *Dunsmore* plaintiffs are a class of individuals who are or were in custody in the San Diego County jails who collectively sued, in pertinent part, for the County's, CHP's, and NaphCare's failures to adequately staff the medical division, including mental health professionals, interference by deputies with the

_____

[7] *See Mother and father sue San Diego County over death of their son in jail*, CBS8, available at: https://www.cbs8.com/article/news/local/the-parents-of-a-man-who-died-in-a-san-diego-county-jail-sues/509-5b59c3d4-4406-43ae-9367-cdbe412fa0cc.

delivery of medical and mental health care, failure to identify and treat medical and mental health conditions at intake, failure to continue medically necessary medications and treatments upon arrival, failure to maintain adequate, accurate, and complete medical records, failure to adequately diagnose individuals and refer them to outside specialists where needed, failure to provide adequate follow-up medical treatment, and failure to implement and maintain quality assurance and improvement processes to ensure adequate care.

94.     Plaintiff further specifically incorporate by reference the declarations by Plaintiff as well as experts filed in the *Dunsmore* case at Doc. No. 119 and Doc. No. 162.

95.    Additionally, the Sheriff's Department's belated implementation of programs and policy changes after Aaron's (and many others') deaths serve to demonstrate the Sheriff's Department's knowledge of and past apathy regarding its failures.

96.    The County purports to be implementing updated protocols for when someone refuses medical or mental health care.

97.    The County is also revising its policies and procedures for implementation in 2023 in the hopes of becoming accredited by the National Commission on Correctional Health Care (NCCHC).

98.    The Sheriff's Department / County jails have never successfully achieved NCCHC certification.

99.    NCCHC sets standards for health services in correctional facilities and operates an accreditation program for institutions that meet those standards.

100.   Rather, in 2017, NCCHC reviewed the practices of San Diego County jails and found they failed to meet 26 of 38 "essential standards."

101.   Had the County addressed known deficiencies within its jails and made changes in order to comply with NCCHC standards earlier, these changes could have saved lives, including Aaron's.

102. In sum, Defendants Ray, Martinez, Montgomery and the County of San Diego were aware of a perpetual pattern of preventable in-custody deaths caused by Defendants' systemic and wide-ranging misconduct, negligence, and failures.

# I.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983: Fourteenth Amendment Deliberate Indifference
### (By Plaintiff As Successor-in-Interest Against Irwin, Ray, Montgomery, Martinez, Cruz, Doe Deputies, Doe Medical Providers, Doe Deputy Supervisors)

103. Plaintiff alleges and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

104. Plaintiff alleges this cause of action as Aaron's successors in interest.

105. The actions and omissions by Defendants constituted objective and subjective deliberate indifference to Aaron's medical needs and unsafe conditions of confinement. Defendants' actions and omissions violated the due process clause of the Fourteenth Amendment prohibiting deprivation of life without due process of law.

106. Defendants made intentional decisions and omissions regarding Aaron's conditions of confinement and the denial of adequate medical care, including but not limited to:

    a. Ignoring Aaron's pleas for help;

    b. Failing to take Aaron's pleas for help seriously due to his known history of suffering from mental health conditions;

    c. Relying on outdated vital signs in deciding to ignore his pleas for help;

d.  Failing to summon medical care despite his prolonged pleas for help and knowing that Aaron had chronic and serious health conditions that could result in serious illness or death if untreated;

e.  Failing to properly maintain working call buttons and/or ignoring Aaron's and other detainees' requests for help;

f.  Failing to adequately administer medical care;

g.  Failing to timely administer proper medical care;

107.  Defendants' intentional decisions and omissions put Aaron at substantial risk of suffering serious harm.

108.  Defendants did not take reasonable available measures to abate or reduce the risk of serious harm, even though a reasonable officer or employee under the circumstances would have understood the high degree of risk involved—making the consequences of the defendants' conduct obvious.

109.  As alleged above, Defendants' conduct and omissions constituted various policy violations.

110.  Defendants' deliberate indifference was an actual and proximate cause of Plaintiff's damages including both Aaron's pain and suffering prior to his death and his death.  Plaintiff seeks compensatory damages.

111.  Plaintiff also seeks punitive damages against the individual defendants on the grounds that Defendants acted with deliberate and reckless disregard of Aaron's constitutional rights.

112.  Plaintiff are entitled to costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

## II.

### SECOND CAUSE OF ACTION

**42 U.S.C. § 1983: Fourteenth Amendment Substantive Due Process**

**(By Plaintiff As An Individual Against Irwin, Ray, Montgomery, Martinez, Cruz, Doe Deputies, Doe Medical Providers, Doe Deputy Supervisors)**

113.   Plaintiff alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

114.   Plaintiff Barbara Brisson as an individual, alleges this Fourteenth Amendment substantive due process claim against Defendants for depriving them of their rights to companionship and society with their son, Aaron.

115.   While Aaron was in their custody and care, Defendants had adequate time to reflect and reason prior to acting or failing to act.  Because Aaron's health deteriorated over the span of several days, actual deliberation was practical.

116.   Yet, Defendants' actions and omissions constituted objective deliberate indifference to Aaron's medical needs and unsafe conditions of confinement.

117.   Plaintiff specifically incorporate by reference here, as alleged in the above cause of action, the myriad ways in which Defendants made intentional decisions and omissions regarding Aaron's conditions of confinement and their denial of adequate medical care.

118.   Defendants' deliberate indifference was an actual and proximate cause of Plaintiff's economic and non-economic damages including funeral expenses, loss of love, companionship, society, comfort, care, assistance, protection, and moral support.  Plaintiff seek compensatory damages.

119.   Plaintiff also seek punitive damages on the grounds that Defendants acted with deliberate and reckless disregard of Aaron's constitutional rights.

120.   Plaintiff are entitled to costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

### III.

### THIRD CAUSE OF ACTION

**42 U.S.C. § 1983: Fourteenth Amendment Deliberate Indifference (*Monell*)**

**(By Plaintiff As An Individual Against Defendants County, CHP, and NaphCare)**

121.   Plaintiff allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

122.   Defendant County was acting under color of state law because its employees and agents were acting or purporting to act in the performance of their official duties as deputies and employees of the County.

123.   Defendants CHP and NaphCare wer acting under color of state law because they are private entities that contracted with Defendant County to perform the state function of providing medical care within the County's jails.  Defendant CHP's and NaphCare's employees and agents were acting or purporting to act in the performance of their official duties as contractors with the County.  *See West v. Atkins*, 487 U.S. 42, 53–54 (1988); *Lopez v. Dep't of Health Servs.*, 939 F.2d 881, 883 (9th Cir. 1991) (per curiam); *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 757 (9th Cir. 2020) (stating a private physician under contract with a state to provide medical services to inmates was a state actor for purposes of section 1983).

124.   As alleged above, Defendants County, CHP and NaphCare, by and through their employees, agents, and contractors, deprived Aaron of his constitutional rights under the due process clause of the Fourteenth Amendment prohibiting deprivation of life without due process of law.

125.   Defendants County, CHP, and NaphCare, by and through their employees, agents, and contractors, acted pursuant to the following official policies, or widespread or longstanding practices or customs, of Defendants County, NaphCare, and CHP:

    a.   Failing to communicate detainees' medical needs between medical staff and deputies;

    b.   Providing insufficient medical care to detainees;

    c.   Failing to transfer detainees to the hospital when medically necessary;

    d.   Failing to respond properly or timely to serious medical needs of detainees;

    e.  Failing to conduct timely safety checks;

    f.  Failing to monitor live video feeds for signs of medical distress;

    g.  Failing to properly maintain working call buttons in the housing areas;

    h.  Failing to recognize when a detainee has serious medical needs during safety checks;

    i.  Failing to meet accepted community standards of care with respect to medical care of detainees; and

    j.  Failing to properly investigate in-custody deaths and properly respond to the results of those investigations to prevent further deaths.

126.  Defendants County, NaphCare, and CHP knew of a substantial risk that their polices were inadequate to prevent violations of law by its employees and agents.  Defendants were deliberately indifferent to this risk and the well-documented history of widespread unconstitutional acts by employees and agents at the jail.  Yet, Defendants failed to set forth appropriate policies regarding the treatment of detainees.

127.  Defendants County, NaphCare and CHP are also liable in that Aaron's death was also the result of a failure to train their employees, contractors, and agents to properly evaluate the health of and risks to detainees at intake and while in custody, to identify serious symptoms of medical distress, to determine proper and adequate courses of treatment for detainees in need of medical treatment, and how to summon and provide adequate medical care when necessary.

128.  The County, NaphCare, and CHP knew their failure to adequately train their staff made it highly predictable and foreseeable that its employees and agents would engage in conduct that would deprive detainees of constitutionally protected rights and result in additional deaths.  The County, NaphCare and CHP were deliberately indifferent to the rights of individuals in their custody and care as evidenced by their knowledge of disparately high rates of in-custody deaths, systemic failures, and the fact that the individual deputies and medical providers

who they failed to properly train would come into contact with detainees.  The inadequacy of the County's, NaphCare's and CHP's training actually caused Aaron's constitutional deprivations.

129.   Defendant County also acted through and is liable by virtue of its final policymakers, such as Ray and Martinez, and/or their subordinates who had been delegated final policymaking authority.  Defendant County's final policymakers, including Ray and Martinez, and/or their subordinates were acting under color of state law.  Their final policymaking authority concerned all constitutional violations described in this Complaint.

130.   Defendant CHP and Defendant NaphCare also acted through and is liable by virtue of its final policymakers and/or their subordinates who had been delegated final policymaking authority.  Defendant CHP's and Defendant NaphCare's final policymakers and/or their subordinates were acting under color of state law.  Their final policymaking authority concerned all constitutional violations described in this Complaint.

131.   Defendant County is also liable based on Ray's and Martinez's failure to enact new and different policies despite their knowledge of woefully inadequate care of past detainees, a high rate of substance use prior to booking, and a high rate of in-custody deaths at the San Diego County Jail.

132.   Defendants CHP and NaphCare are also liable based on their policymakers' and their policymakers' subordinates' failure to enact new and different policies despite their knowledge of woefully inadequate care of past detainees, a high rate of substance use prior to booking, and a high rate of in-custody deaths at the San Diego County Jail.

133.   Defendant County is also liable based on their ratification and approval of the constitutional, statutory, and other law violations as alleged in this Complaint.

134.    Defendants CHP and NaphCare are also liable based on their ratification and approval of the constitutional, statutory, and other law violations as alleged in this Complaint.

135.    Defendant County's, Defendant NaphCare's, and Defendant CHP's policies, customs, or practices, actions and failures to act by final policymakers, ratification of constitutional and law violations, and failure to train its employees, caused Aaron's deprivation of rights by the individual defendants.  That is, Defendants' policies, customs, or practices, actions and failures to act by final policymakers, ratification of constitutional and law violations, and failure to train its employees were so closely related to Aaron's deprivation of rights that they were the moving force causing Aaron's injury and death.

136.    Defendant County's, Defendant NaphCare's and Defendant CHP's actions and omissions actually and proximately caused Plaintiff's economic and non-economic damages including funeral expenses, loss of love, companionship, society, comfort, care, assistance, protection, and moral support.  Plaintiff seek compensatory damages.

137.    Plaintiff also seeks punitive damages on the grounds that Defendants acted with deliberate and reckless disregard of Aaron's constitutional rights.

138.    Plaintiff is entitled to costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

**IV.**

**FOURTH CAUSE OF ACTION**

**42 U.S.C. § 1983: Fourteenth Amendment Substantive Due Process (*Monell*)**

**(By Plaintiff As An Individual Against Defendants County, NaphCare and CHP)**

139.    Plaintiff alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.  Plaintiff specifically repeats and

incorporates by reference the *Monell* theories of liability set forth in the above cause of action in particular, in support of this claim.

140.   Defendant County was acting under color of state law because its employees and agents were acting or purporting to act in the performance of their official duties as deputies and employees of the County.

141.   Defendant CHP and Defendant NaphCare were acting under color of state law because it is a private entity that contracted with Defendant County to perform the state function of providing medical care within the County's jails. Defendant CHP's and Defendant NaphCare's employees and agents were acting or purporting to act in the performance of their official duties as contractors with the County.

142.   As alleged above, Defendants County, NaphCare, and CHP, by and through their employees and agents, deprived Barbara Brisson of her rights to companionship and society with her son, Aaron, in violation of the Fourteenth Amendment.

143.   Defendant County's, Defendant NaphCare's and Defendant CHP's actions and failures to act actually and proximately caused Plaintiff's economic and non-economic damages including loss of love, companionship, society, comfort, care, assistance, protection, and moral support.  Plaintiff seeks compensatory damages.

144.   Plaintiff also seeks punitive damages on the grounds that Defendants acted with deliberate and reckless disregard of Aaron's constitutional rights.

**V.**

**FIFTH CAUSE OF ACTION**

**Cal. Gov. Code § 52.1 (Bane Act)**

**(By Plaintiff as Successor-in-Interest Against County, Irwin, Ray, Montgomery, Martinez, Cruz, Doe Deputies, Doe Medical Providers, Doe Deputy Supervisors, CHP, and NaphCare)**

145.   Plaintiff alleges and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

146.   Pursuant to Cal. Gov. Code § 377.30, Plaintiff Barbara Brisson asserts this claim as successor-in-interest.

147.   As alleged above, Defendants acted, or failed to act, with deliberate indifference to the substantial risk to Aaron's health and safety while he was in their custody and care.  Defendants' due process violations are sufficient in and of themselves to constitute violations of the Bane Act.

148.   "Plaintiffs bringing Bane Act claims for deliberate indifference to serious medical needs must only allege prison officials 'knowingly deprived [them] of a constitutional right or protection through acts that are inherently coercive and threatening,' such as housing a prisoner in an inappropriate cell, failing to provide treatment plans or adequate mental health care, and failing to provide sufficient observations." *Lapachet v. California Forensic Med. Grp., Inc.*, 313 F. Supp. 3d 1183, 1195 (E.D. Cal. 2018).

149.   As alleged above, Defendants knowingly deprived Aaron of constitutionally protected rights by:

   a.   Ignoring Aaron's pleas for help;

   b.   Failing to take Aaron's pleas for help seriously due to his known history of suffering from mental health conditions;

   c.   Relying on outdated vital signs in deciding to ignore his pleas for help;

   d.   Failing to summon medical care despite his prolonged pleas for help and knowing that Aaron had chronic and serious health conditions that could result in serious illness or death if untreated;

   e.   Failing to properly maintain working call buttons and/or ignoring Aaron's and other detainees' requests for help;

   f.   Failing to adequately administer medical care;

g.  Failing to timely administer proper medical care;

150.   Defendants' deliberate indifference was an actual and proximate cause of Aaron's pain, suffering, and death, which were a direct and foreseeable result of Defendants' actions and inaction.

151.   Plaintiff seek compensatory damages including for the pain and suffering Aaron was subjected to prior to his death pursuant to Cal. Civ. Proc. § 377.34(b).  Plaintiff also seek all statutory remedies available pursuant to Cal. Civ. Code § 52 and 52.1 including civil penalties, treble damages, and attorneys' fees.

152.   Pursuant to Cal. Gov. Code § 815.2, the County is vicariously liable for the actions and/or omissions of its employees, contractors, or agents, Defendants Irwin, Cruz, Ray, Montgomery, Martinez, Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors because they were acting within the scope of their employment.

153.   Defendant CHP is vicariously liable for the conduct of their employees, agents, and contractors because they were acting within the scope of their employment.

## VI.

## SIXTH CAUSE OF ACTION

### Cal. Gov. Code § 845.6 (Failure to Summon Medical Care)

### (By Plaintiff as Successor-in-Interest Against Defendants County, Ray, Montgomery, Martinez, Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors)

154.   Plaintiff alleges and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

155.   Plaintiff asserts this claim as successor-in-interest pursuant to Cal. Civ. Proc. § 377.30.

156.   Defendants Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors:

a.     Knew or had reason to know that Aaron required medical care;

b.     Knew or had reason to know that Aaron's need for medical care was immediate; and

c.     Failed to take reasonable action to summon medical care.

157.   Regarding (a), Defendants Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors knew or had reason to know that Aaron required medical care for a multitude of reasons, including but not limited to: his well-documented chronic medical history, and the fact that he had been in their custody in the past, his repeated requests for medical treatment on the night of October 23, 2022, and his signs and symptoms of illness such as lying on the ground.

158.   Regarding (b), Defendants Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors knew or should have known of Aaron's need for medical care was immediate because of all of the circumstances and symptoms described above.

159.   Regarding (c), Defendants Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors failed to take reasonable action to summon medical care: ignoring his pleas for medical care and to be taken to the hospital.

160.   Pursuant to Cal. Gov. Code §§ 845.6 and 815.2, Defendant County is liable because Defendants Ray, Montgomery, Martinez, Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors were at all times acting within the scope of their employment.

161.   Defendants Montgomery, Ray, and Martinez are liable for Doe Deputies' and Doe Deputy Supervisors' failure to summon medical care, as described above, and due to their negligent supervision and training of employees regarding when to summon medical care.

162.   Defendants are not immune from liability pursuant to Cal. Gov. Code § 844.6, which is inapplicable to allegations for failure to summon medical care arising under § 845.6. *See Hart v. Orange Cnty.*, 254 Cal. App. 2d 302, 306 (Ct.

App. 1967); *Sanders v. Yuba Cnty.*, 247 Cal. App. 2d 748, 754 (Ct. App. 1967); *Greer v. Cnty. of San Diego*, No. 19CV378-JO-DEB, 2023 WL 2316203, at *15 (S.D. Cal. Mar. 1, 2023) (stating § 845.6 claims for failure to summon medical care are excepted from § 844.6's grant of immunity).

163. Defendants' conduct was an actual and proximate cause of Aaron's pain, suffering, and death, which were direct and foreseeable results of Defendants' conduct.

164. Plaintiff Barbara Brisson seeks compensatory damages for Aaron's pain and suffering prior to his death, *see* Cal. Civ. Proc. § 377.34(b), as well as damages for his death.

**VII.**

**SEVENTH CAUSE OF ACTION**

**Negligence**

**(By Plaintiff as Successor-in-Interest Against County, Irwin, Ray, Montgomery, Martinez, Cruz, Doe Deputies, Doe Medical Providers, Doe Deputy Supervisors, CHP, and NaphCare)**

165. Plaintiff alleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

166. Plaintiff alleges this claim as successor in interest pursuant to Cal. Civ. Proc. § 377.30.

167. All individual defendants owed Aaron a duty of reasonable care as "jailers" due to Aaron's position of dependence and vulnerability in the jail context.

168. As alleged above, Defendants breached that duty. Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors negligently failed to recognize, document, and monitor Aaron's serious medical needs and failed to summon medical treatment while he pleaded for help over the span of hours. Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors violated multiple County

policies applicable to deputies and staff of the Medical Services Division by failing to summon care when needed, ignoring Aaron's pleas for help, and failing to maintain information timely and adequately in the JIMs system.

169.   Defendants Irwin, Cruz, Ray, Martinez, and Montgomery negligently failed to ensure that all detainees with chronic medical conditions receive proper medical care, including an appropriate treatment plan, evaluation by a physician, and continuity of care despite their knowledge of woefully inadequate care of past detainees, and a high rate of in-custody deaths.

170.   All individual defendants failed to avoid violating Plaintiff's constitutional rights pursuant to the Fourteenth Amendment as alleged above.

171.   The County, Defendant NaphCare, and Defendant CHP are vicariously liable for the conduct of Defendants Irwin, Cruz, Ray, Martinez, Montgomery, Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors to the extent that they are employed by the County, Defendant NaphCare, and/or Defendant CHP.

172.   Pursuant to Gov. Code § 855.8, the individual defendants, who were at all times relevant acting within the scope of their employment, are liable for failing to use due care and proximately causing Aaron's injuries due to their negligence and wrongful acts and omissions in providing such treatment.

173.   Aaron's injury and death were foreseeable results of Defendants' negligence.

174.   Defendants' negligence was the actual and proximate cause of Aaron's pain, suffering, and ultimate death.

175.   Plaintiff, Aaron's successor-in-interest, seeks compensatory damages including for Aaron's pain and suffering prior to his death pursuant to Cal. Civ. Proc. § 377.34(b).

## VIII.
## EIGHTH CAUSE OF ACTION

## Negligence: Negligent Training and Supervision[8]

## (By Plaintiff as Successor-in-Interest Against Defendants County, Ray, Montgomery, Martinez, Doe Deputy Supervisors, CHP and NaphCare)

176.   Plaintiff alleges and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

177.   Plaintiff alleges this claim as successor in interest pursuant to Cal. Civ. Proc. § 377.30.

178.   Defendants had a duty to use reasonable care in the training and supervision of its employees, deputies, sworn staff, contractors, and agents.

179.   Defendants had a duty to properly train and supervise their employees to use reasonable care in evaluating the health of and risks to detainees and determining the proper and adequate course of treatment for detainees in need of medical treatment.

180.   Defendants had a duty to properly train and supervise their employees to summon medical care for detainees whom they knew, or had reason to know, required medical care.

181.   Defendants failed to train their employees, contractors, and agents to properly evaluate the health of and risks to detainees at intake and while in custody, to identify serious symptoms of medical distress, to determine proper and adequate courses of treatment for detainees in need of medical treatment, and how to summon and provide adequate medical care when necessary.

182.   Defendants knew their failure to adequately train their staff made it highly predictable and foreseeable that its employees and agents would engage in conduct that would cause detainees harm and result in additional deaths.

---

[8] Plaintiff alleges the instant claim as a separate cause of action for the sake of clarity, understanding that it constitutes a theory of liability for the overarching tort of negligence.

Defendants knew of the County's disparately high rates of in-custody deaths, systemic failures, and the fact that the individual deputies and medical providers who they failed to properly train would come into contact with detainees.

183.   Defendants breached their duty of care such that Aaron's prolonged health crisis was deliberately ignored.

184.   The inadequacy of Defendants' training actually caused Aaron's pain, suffering, and death.  Had Defendants trained their employees, agents, and contractors properly, staff would have responded properly to Aaron's need for medical care, furnished and/or summoned requisite care, and Aaron would not have suffered prolonged pain and would still be alive today.

185.   The County, NaphCare and CHP are vicariously liable for the conduct of individual defendants in supervisory and training positions who were acting within the scope of their employment with those entities: Defendants Ray, Montgomery, Martinez, and Doe Deputy Supervisors.

186.   As a direct, proximate, and foreseeable result of Defendants' breach of their duty of care, Plaintiff suffered damages in an amount according to proof at the time of trial.

187.   Plaintiff, Aaron's successors-in-interest, seek compensatory damages including for Aaron's pain and suffering prior to his death pursuant to Cal. Civ. Proc. § 377.34(b).

## IX.

## NINTH CAUSE OF ACTION

## Wrongful Death

## (By Plaintiff as An Individual Against County, Ray, Irwin, Montgomery, Martinez, Cruz, Doe Deputies, Doe Medical Providers, Doe Deputy Supervisors, CHP, NaphCare)

188.   Plaintiff alleges and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

189.   Plaintiff, as Aaron's mother, has standing to assert a claim for wrongful death.  Plaintiff had no spouse or issue.  *See* Cal. Civ. Proc. § 377.60; Ex. A.

190.   As alleged above, Defendants violated Gov. Code § 845.6, which constitutes "wrongful acts" within the meaning of § 377.60.

191.   As alleged above, Defendants violated § 1983 by showing deliberate indifference to Aaron's medical needs.  This constituted "wrongful acts" within the meaning of § 377.60.

192.   As alleged above, Defendants committed tortious (including negligent) conduct, which constituted "wrongful acts" within the meaning of § 377.60.  *See Lattimore v. Dickey*, 239 Cal.App.4th 959 (2015).

193.   Defendants' conduct constituted actual and proximate causes of Aaron's pain, suffering, and death, which were direct and foreseeable results of Defendants' conduct.

194.   Defendant County is liable for the conduct of the individual defendants who were acting within the scope of their employment with the County. *See* Cal. Gov. Code §§ 815.2, 845.6.

195.   Defendants CHP and NaphCare are vicariously liable for the conduct of their employees, agents, and contractors who were acting within the scope of their employment.

196.   Plaintiff Barbara Brisson seeks economic and non-economic damages in an amount to be proven, including compensatory damages which include, but are not limited to, any coroner's fees and funeral expenses, emotional distress, loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

## PRAYER FOR RELIEF

Plaintiff pray for judgment against defendants as follows:

a.   General and compensatory damages in an amount according to proof;

b.   Punitive and exemplary damages against all individual defendants;

c.   Civil penalties as provided by law;

d.   Attorney fees pursuant to Cal. Civil Code § 52.1(b) and Cal. Civil Code § 52;

e.   Costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988;

f.   All other damages, penalties, costs, and fees as allowed by Cal. Civ. Proc. §§ 377.20, 377.60, 1021.5

g.   Costs;

h.   And for all other and further relief as the Court may deem proper.

DATE: November 22, 2023                MCKENZIE SCOTT, PC


By: _____
     TIMOTHY A. SCOTT
     LAUREN M. WILLIAMS
     MICHELLE C. ANGELES
     Attorneys for Plaintiff

COMPLAINT